UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEBRADRE D. JACKSON,

        Plaintiff,

v.                                                   Case No. 16-cv-1454-pp

DOMINIC CORRAO,

        Defendant.

---

**DECISION AND ORDER GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 19) AND DISMISSING CASE**

---

The plaintiff, a Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendant violated his civil rights at the Racine Correctional Institution ("RCI"). Dkt. No. 1. The court screened the complaint, and allowed the plaintiff to proceed with an Eighth Amendment claim that Dominic Corrao showed deliberate indifference toward his serious medical needs following a seizure. Dkt. No. 7. The defendant filed a motion for summary judgment, dkt. no. 19, which is fully briefed. The court will grant the motion, and dismiss the case.

## I. THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A. Facts[1]

The plaintiff is an inmate at RCI, dkt. no. 32 at ¶1, where the defendant is a correctional sergeant, id. at ¶3.

On October 2, 2016, around 7:10 p.m., one of the correctional officers at RCI, Officer Sairs, saw the plaintiff's cellmate (whose name was Cunningham) run out of their cell, saying "[m]y cellmate is having a seizure." Id. at ¶¶4-5. Sairs was about three doors away. Id. at ¶5. Sairs went to the plaintiff's cell, and saw him lying on the floor, "having what appeared to be a seizure." Id. at ¶7. He radioed the defendant, who was the second shift sergeant, and the security staff at the control center, asking for help. Id. at ¶8. He then went into the plaintiff's cell. Id. at ¶9.

The parties agree that Sairs appropriately responded to the plaintiff's medical condition after entering his cell. Dkt. No. 31 at ¶2; Dkt. No. 32 at ¶¶17-19. He placed his hands between the plaintiff's head and the wall to prevent the plaintiff from hitting his head, and rolled up a bed sheet to put between the plaintiff's head and the wall. Dkt. No. 32 at ¶17. Some fifteen seconds later, Officer Walker arrived and helped Sairs to stabilize the plaintiff. Id. at ¶18; Dkt. No. 31 at ¶3. A minute or so after the plaintiff's seizure started, it stopped, and the plaintiff lay on the floor "motionless for about two minutes

---

[1] The court takes the facts from the defendant's reply to the plaintiff's response to the defendant's proposed findings of fact, dkt. no. 32; the defendant's response to the plaintiff's statement of additional facts, dkt. no. 31; and the plaintiff's sworn complaint, dkt. no. 1, which the court construes as an affidavit for purposes of summary judgment. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).

2

just breathing." Dkt. No. 32 at ¶19; see also Dkt. No. 31 at ¶4. At this point, Walker left the cell. Dkt. No. 32 at ¶20; Dkt. No. 31 at ¶5.

The parties dispute what happened next. The defendant says that when he received Sairs's radio contact, he notified the control staff center, asked for extra support and then went to the plaintiff's cell; he does not say where he was when he did this. Dkt. No. 32 at ¶10. The defendant says that Walker left the plaintiff's cell when the defendant arrived. Id. at ¶20. He maintains that when he reached the cell, he saw the plaintiff on the floor, beginning to "regain consciousness." Id. at ¶21.

The defendant explains that he and Sairs had radios with them, and could contact the control center and the supervisors while going to wherever assistance was needed. Id. at ¶13. He asserts, however, that "contact with the Health Services Unit staff is done by telephone, which is located within the security control center;" he does not explain why. Id. at ¶14. He says that it is the responsibility of the control center staff to contact the security supervisor on duty and Health Services Unit ("HSU") staff. Id. The defendant admits that neither he nor Sairs "personally" contact HSU about the plaintiff's situation. Id. at ¶12. He says that for him (or Sairs) to contact HSU personally, they would "have had to go to the control center and make the phone call, which would take time away from assisting [the plaintiff.]" Id. at 15. The defendant asserts that "it was more efficient for Sairs and [the defendant] to contact the control center because the control center staff had immediate access to the telephone to call the Health Services Unit." Id. at 16.

3

The plaintiff says that the defendant did not go directly to the plaintiff's cell when he received Sairs's radio notification; he maintains that the defendant "had to stay at the Officer's station until Officer Walker came to relieve him." Dkt. NO. 27 at ¶10. The plaintiff disputes that it was the responsibility of the Central Control Center staff to contact the Health Services Unit. Id. at ¶14. The plaintiff maintains that neither the defendant nor Sairs was required to go to the Control Center to call HSU; he says there was a phone at the Officer Station, which is where he argues the defendant was during the time he was having the seizure. Id. at ¶15. The plaintiff claims that the defendant had "immediate access to a telephone at the" officer's station "as [the defendant] waited to be relieved by Officer Walker." Id. at ¶16. He asserts that Walker did not leave the plaintiff's cell when the defendant arrived; he says instead that Walker left the cell to go relieve the defendant from the officer's station. Id. at ¶20.

The parties agree that when the defendant arrived at the plaintiff's cell, the plaintiff was regaining consciousness. Dkt. No. 32 at ¶21. They agree that the defendant and Sairs started asking the plaintiff questions—his name, his corrections number, his date of birth, whether he knew where he was. Id. at ¶22. The defendant says that that the plaintiff responded with statements like "I know my name!," and "Why do you want to know my name?" and "I am not in prison." Id. The plaintiff disputes that this is how he answered those questions. Dkt. No. 27 at 22. The defendant also says that when the plaintiff saw the badges on Sairs's and the defendant's uniforms, he "exclaimed 'Oh!

4

You the Po Po' (meaning police) and stuck his hands up in the air." Dkt. No. 32 at ¶23. The plaintiff responds that he does not recall any remarks he made, or whether he made any at all. Dkt. No. 27 at ¶23. The parties agree that during the questioning, the plaintiff tried to get up and move around, but that the defendant and Sairs told him to "sit or lie down and try to remain relaxed." Dkt. No. 32 at ¶24.

The defendant asserts that the plaintiff's "symptoms were atypical of a normal seizure because of his active attempts to stand, his lack of exhaustion, his ability to respond, and his coherence within such short time frame after the supposed seizure." Id. at ¶25. He says he believed that, rather than suffering from a seizure, the plaintiff "was high on an illegal substance." Id. at ¶26. He says that because of this suspicion, he started looking around the plaintiff's cell "for a possible cause of" the plaintiff's "symptoms." Id. at ¶27. The defendant asserts that "[t]here had been other incidents at [RCI] where inmates had been experiencing seizure like symptoms due to the use of contraband substance known as K2, which is a synthetic form of cannabis." Id. at ¶28. While looking around the plaintiff's cell, the defendant "notice a green leafy substance and a freshly used homemade pipe made of rolled paper and a charred tin foil cap located on an inmate desk within six inches of [the plaintiff's] identification tag." Id. at ¶29. (It is undisputed that Sairs observed the pipe and the substance. Id. at ¶30.)

The plaintiff asserts that officers such as the defendant were not "permitted" to determine his medical care, and that after an emergency, his

5

medical care should have been determined by a "qualified Health Professional." Dkt. No. 27 at ¶25. He asserts that the defendant was not qualified to make decisions about what was causing the plaintiff's symptoms. Id. at ¶26. The plaintiff doesn't dispute the other incidents at RCI involving K2, but asserts that if somehow his incident had involved K2, the defendant "knew of the dangers of K2 and it could kill a person." Id. at ¶28.

Other prison staff arrived at the plaintiff's cell around 7:17 p.m. (about seven minutes after the plaintiff's cellmate came out of the cell), dkt. no. 32 at ¶32, and while they helped the plaintiff up and prepared him for removal from the cell, the defendant took the items he'd observed on the desk and went back to the officer's station, id. at ¶33. (The plaintiff does not dispute this, but points to the fact that the defendant said that he *went back* to the officer's station, which the plaintiff indicates shows where the defendant was when he was notified that the plaintiff was having seizure-like symptoms. Dkt. No. 27 at ¶33.) After the defendant arrived at the officer's station, he says that Lieutenant Jones called him; the defendant told Jones what he'd found in the plaintiff's cell. Dkt. No. 32 at ¶34. According to the defendant, Jones said that he was "reporting to the unit to place [the plaintiff] in Temporary Lock-up status." Id. at ¶35. The plaintiff was taken to the restrictive housing unit for placement in temporary lockup, "pending investigation into the substance found in [the plaintiff's] cell, based on the directives of Lieutenant Jones." Id. at ¶36.

The parties agree that while staff members were escorting the plaintiff to the restrictive housing unit, he needed help getting down the stairs "because he did not seem to be able to do it on his own and seemed to be stumbling down the stairs . . . ." Id. at ¶37. The defendant, however, asserts that the plaintiff was "giggling" during the trip down the stairs, id., while the plaintiff asserts that he was not giggling, but "moaning in pain," dkt. no. 27 at ¶37. It is undisputed that it was Sairs's opinion that the plaintiff "seemed to be high on K2." Dkt. No. 32 at ¶30. It is also undisputed that Jones joined the escort, that he questioned the plaintiff about "the incident" and that the plaintiff "informed" Jones that "the substance was K2 and [the plaintiff] admitted to smoking it." Id. at ¶¶39-40.

The defendant drafted a conduct report on the incident, dkt. no. 24-1, but had no further involvement after that point. Id. at ¶¶ 41-42. The defendant was not assigned to the Restrictive Housing Unit, and it is undisputed that he had no "knowledge or authority as to the actions that took place after [the plaintiff] was escorted there." Id. at ¶43. According to the "supervisor comments" on the conduct report, dkt. no. 24-3 at 2, the plaintiff "refused medical attention." Id. at ¶46. The plaintiff disputes that he was offered or refused medical attention. Dkt. No. 27 at ¶46.

    B.    Discussion

        1.    *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

7

judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); United States v. Luce, 873 F.3d 999, 1005 (7th Cir. 2017). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

2. *Eighth Amendment Standard for Deliberate Indifference*

Prison officials violate the Eighth Amendment when their conduct demonstrates deliberate indifference to a substantial risk of serious harm to inmate health or safety. See Farmer v. Brennan, 511 U.S. 825, 834 (1994).

8

Deliberate indifference contains both an objective element and a subjective element <u>Id.</u>

"To satisfy the objective component, a prisoner must demonstrate that his medical condition is 'objectively, sufficiently serious.'" <u>Greeno v. Daley</u>, 414 F.3d 645, 653 (7th Cir. 2005) (quoting <u>Farmer</u>, 511 U.S. at 834). "A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." <u>Id.</u> (citations omitted). "Notably, '[a] medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011) (quoting <u>Gayton v. McCoy</u>, 593 F.3d 610, 620 (7th Cir. 2010)).

To prove the subjective element, a plaintiff must prove that the prison official "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed], and he must also [have] draw[n] the inference." <u>Farmer</u>, 511 U.S. at 837. A prison official must have actual knowledge of the inmate's serious medical condition and either act or fail to act in disregard of that risk. <u>Elyea</u>, 631 F.3d at 857. Deliberate indifference "is more than negligence and approaches intentional wrongdoing." <u>Collignon v. Milwaukee C'nty</u>., 163 F.3d 982, 988 (7th Cir. 1998).

9

3.  *Analysis*

The defendant conceded (for the purposes of summary judgment only) that the plaintiff had an objectively serious medical condition. Dkt. No. 20 at 8. The court need not analyze that objective element, and will move on to the subjective one: whether the defendant was deliberately indifferent to that serious medical condition.

The defendant asserts that the court should grant summary judgment on the question of deliberate indifference for several reasons.[2] First, he argues that the evidence shows that after the seizure was over, while the plaintiff was in the restrictive housing unit, the plaintiff was given the option of medical treatment, but that he refused it. Dkt. No. 20 at 10. He relies on an incident report which shows "supervisor comments" from supervisor Michael A. Meyer, in which Mayer says, "Inmate refused medical attention." Dkt. No. 24-3 at 2. In his sworn declaration under 28 U.S.C. §1746, the plaintiff disputes that he was offered, or that he refused, medical treatment. Dkt. No. 26 at ¶12. The plaintiff's affidavit arguably is self-serving, but that does not mean it cannot raise a dispute as to an issue of material fact for purposes of summary judgment. See Buie v. Quad/Graphics, Inc., 366 F.3d 496, 504 (7th Cir. 2004). The plaintiff's affidavit is "based upon [his] personal knowledge," so assuming

---

[2] The summary judgment motion and response refer both to the defendant and to Sairs. On August 2, 2017—the day before the defendant filed the motion for summary judgment—the court received the plaintiff's motion to dismiss Sairs as a defendant. Dkt. No. 17. Through an oversight, the court did not grant that motion until December 14, 2017, dkt. no. 33, well after the parties had fully briefed the summary judgment motion.

that the question of whether the plaintiff was offered medical assistance is material, his declaration raises an issue of fact.

Second, the defendant argues that he provided appropriate medical care to the plaintiff while he was in the plaintiff's cell. Dkt. No. 20 at 10. He asserts that he maintained "constant contact" with the plaintiff while in the cell, that he "tried to keep" the plaintiff from hitting his head on the wall and the locker, and that he waited until the plaintiff had become stable before the plaintiff was transferred to another unit. Id. at 10-11. The record does not support the defendant's allegations that the *defendant* did these things. The defendant's proposed findings indicate that *Sairs* tried to keep the plaintiff's head from hitting the floor or wall, not the defendant. The proposed findings do not actually indicate that the defendant waited to call the other officers until the plaintiff was stable; instead they indicate that the plaintiff was involved in looking at the leafy substance while he was in the plaintiff's cell. This argument does not necessarily support a grant of summary judgment.

Third, the defendant asserts that the fact that he didn't contact the HSU himself is not relevant, because he relied on control center staff to do so, so that they could contact HSU to provide help. Id. at 11. He argues that although he had a radio, he couldn't use it to contact the HSU, because the only way to contact the HSU would have been by using the telephone in the control center. Id. He says that because the phone is in the control center, it was the control center staff's responsibility to notify the HSU of the plaintiff's medical situation, and that his reliance on the control center to contact HSU was proper. Id. In

his proposed findings of fact, the defendant also asserted that it would have been inefficient, and possibly detrimental to the plaintiff, for him to go to the control center to make the phone call, rather than going directly to the plaintiff's cell, when he could radio control staff and they could make the call. Dkt. No. 21 at ¶¶15-16.

The plaintiff, in his response to the defendant's proposed findings, disputes that the only way the defendant could have called HSU himself was by going to the control center and using that phone. Dkt. No. 27 at ¶15. He argues that there was a telephone at the officers' station, and posits that the defendant was at the officers' station when he got notice that the plaintiff was in medical distress. Id. at ¶¶15-16. (The only support in the record for the allegation that the defendant was in the officers' station at the time he got the information about the plaintiff, and that there was a phone in the officers' station, is the plaintiff's declaration.) The plaintiff's opposition brief refers to "DAI Policy #500," a reference to the Wisconsin Department of Corrections' Division of Adult Institutions' policies, and argues that under that policy, the defendant should have contacted HSU immediately. Dkt. No. 25 at 5. The plaintiff argues that because the defendant allegedly violated this policy, the defendant was deliberately indifferent to his serious medical need. Id.

While the plaintiff has alleged a dispute over whether the defendant could have called HSU directly, rather than relying on control staff to do so, that dispute is not sufficient to defeat the defendant's motion for summary judgment. The real dispute the plaintiff identifies is that, while the defendant

12

responded to the plaintiff's serious medical condition, the plaintiff believes that the defendant should have responded differently. The Supreme Court has held that even a prison official who knows of a substantial risk to inmate health may not be liable if that official "responded reasonably to the risk . . . ." Farmer, 511 U.S. at 844. "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" Id. at 845 (citations omitted). A non-medical defendant cannot ignore an inmate's serious medical need. Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011). But their duty is to respond reasonably to the risk—not to respond perfectly.

The evidence shows that the defendant *did* respond to the plaintiff's serious medical need.[3] The plaintiff argues, however, that the defendant's response was deliberately indifferent—in the context of the above cases, the court construes the plaintiff's arguments as arguments that the defendant's response was not reasonable under the circumstances. He asserts that the defendant "called everybody except for Medical Personell [sic] in the Health Services Unit." Dkt. No. 25 at 4. He argues that when other officers arrived in his cell to help, the defendant told them that the plaintiff "did not have a

---

[3] To the extent that the plaintiff is arguing that the defendant violated DAI policy by contacting the Control Center instead of directly contacting HSU, his argument cannot succeed. Section 1983 provides a cause of action against a defendant who violates someone's civil rights under the "Constitution and laws" of the United States. A defendant is not liable in a federal §1983 lawsuit unless that defendant's violation of prison policy violated the Constitution or laws of the United States.

seizure but was smoking a Green leafy substance despite knowledge of Jackson actually suffering a seizure-A serious Medical Condition." Id. at 4-5. He characterizes this as a "reckless lie." Id. at 5. He argues that the defendant's choice to call control center staff, rather than contacting HSU directly, showed that the defendant "disregarded the fact that" the plaintiff needed medical care, and that he suffered from a serious medical condition. Id. He argues that, after the fact, the defendant did not inform the defendant's supervisor that the plaintiff had had a seizure. Id. In sum, he asserts that "it was 4 to 5 minutes after Sairs radioed" the defendant that the defendant walked forty feet from the officer's station to the plaintiff's cell, and he argues that because the defendant could have contacted HSU in those four to five minutes and didn't, he was deliberately indifferent. Id. at 6.

The court finds that, even construing the facts in the light most favorable to the plaintiff, the evidence demonstrates that the defendant acted reasonably. The record demonstrates that at 7:10 p.m., Sairs saw the plaintiff's cellmate run out and say that the plaintiff was having a seizure. After seeing the plaintiff lying on the floor, apparently having a seizure, Sairs contacted the defendant; the record does not specify what time the defendant received the message. The defendant notified the control staff, asked for more support and went to the plaintiff's cell; the record does not indicate how long this took. The defendant also notified Lieutenant Jones; again, the record does not say what time. The defendant knew, during whatever time it took, that Sairs was in the plaintiff's cell with the plaintiff. The undisputed facts show that the seizure lasted about

14

a minute. The defendant arrived in the cell after the seizure was over, while the plaintiff was lying motionless on the floor and breathing. When the plaintiff had sufficiently returned to consciousness, the defendant and Sairs asked him questions to determine if he knew who and where he was. Based on the way the plaintiff responded, and what had been going on at RCI with other inmates, the defendant thought that, rather than having a seizure, the plaintiff's symptoms were the result of a reaction to K2. The evidence indicates that the defendant (and Sairs) shared this belief with the other officers who came to the cell to help. Dkt. No. 24-3 at 2.

The defendant took appropriate action. He contacted control staff, whom he believed would call HSU. He asked for support. He called a higher-ranking member of the prison staff, Lieutenant Jones. He went to the plaintiff's cell; there is no evidence, other than the plaintiff's unsupported assertions, that he waited four or five minutes before going. He arrived after the seizure was over; when the plaintiff had begun to regain consciousness, he and Sairs tried to make sure the plaintiff was aware of who he was and where he was. When the plaintiff's answers and behavior struck him as odd, the defendant looked around the cell, and found a substance that he believed might have caused the plaintiff's symptoms. He and Sairs told the other officers that, rather than having a seizure, they believed that the plaintiff was having a reaction to a drug.

The defendant took reasonable action to get help to the plaintiff during the seizure, even if he didn't do it in the way the plaintiff thought most efficient.

There is no evidence that he delayed unreasonably in getting himself to the plaintiff's cell. There is no evidence that expressing his (obviously non-medical) opinion to other officers that the plaintiff's symptoms were the result of a reaction to drugs was unreasonable, or that it was intended to prevent the plaintiff from getting medical help for whatever it was that had caused the seizure. The record as a whole shows that, rather than ignoring the plaintiff's symptoms or being indifferent to them, the defendant responded to them in a reasonable way.

Because the defendant responded, and responded reasonably, to the plaintiff's serious medical condition, the defendant is entitled to judgment as a matter of law.[4] The court will grant summary judgment in favor of the defendant on the plaintiff's deliberate indifference claim, and will dismiss the case.

## IV. CONCLUSION

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 19.

The court **ORDERS** that this case is **DISMISSED**. The clerk of court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by

---

[4] The defendant argued that, if the court concluded that he was not entitled to summary judgment on the merits of the plaintiff's deliberate indifference claim, the court still should grant judgment in his favor because he was entitled to qualified immunity. Dkt. No. 20 at 12. Given its ruling on the merits of the deliberate indifference claim, the court need not analyze the qualified immunity claim.

filing in this court a notice of appeal within **30 days** of the entry of judgment. See Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 9th day of February, 2018.

                                              **BY THE COURT:**

                                              **HON. PAMELA PEPPER**
                                              **United States District Judge**